IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

CYNERGY, LLC, as successor       *
in interest to FARMERS           *
STATE BANK,                      *
                                 *
            Plaintiff,           *
                                 *
       v.                        *          CV 110-068
                                 *
FIRST AMERICAN TITLE             *
INSURANCE COMPANY,               *
                                 *
            Defendant.           *

_____

**AMENDED ORDER**

_____

Presently before the Court in the captioned case are cross-motions for summary judgment by Defendant First American Title Insurance Company ("First American") (doc. no. 25) and Plaintiff Cynergy, LLC ("Cynergy") (doc. no. 30). For reasons stated more fully below, First American's motion is **GRANTED** and Cynergy's motion is **DENIED**.

## I. BACKGROUND

This case regards coverage liability under a lender's title insurance policy issued in connection with a real estate purchase. The pertinent facts are largely undisputed and drawn from the parties' statements of material facts. They are as follows.

**A. The Purchase**

On or about September 5, 2006, the Retreat at Lake Thurmond, LLC (the "Retreat"), a Georgia limited liability company, purchased a 77.75 acre parcel of land (the "Retreat Property") in Lincoln County, Georgia, from Emily Hester.   Tommy Lee, Dean Antonakos ("Dean") and others organized the Retreat as a vehicle to acquire the Retreat Property and develop it into a residential subdivision. A week before closing, the Retreat Property was appraised at $1,749,400.00, assuming it had suitable access for use as a residential subdivision.   However, the Retreat Property had no dedicated right of access to a public road.   Hester later indicated that it was primarily for this reason that she sold the Retreat Property (Hester Aff. ¶ 8), and an attorney acting on behalf of the Retreat sought to obtain a lower purchase price during negotiations due to the lack of dedicated access (C. Turner Aff. ¶ 6).   In the end, the Retreat Property was purchased for $775,000, Hester's original asking price.   (Lee Dep. at 21.)

Farmers State Bank in Lincolnton, Georgia (the "Bank") financed the full purchase amount with a short term acquisition loan.   The loan was intended only to finance acquisition of the Retreat Property, with development to be financed separately at a later date.   (J. Bruce Turner Dep. at 27; Leverett Aff. ¶ 5.)   In return for financing, the Bank received a promissory note (the "Retreat Note"), personal guaranties from Lee and Dean, as well as

deeds to secure debt on the Retreat Property, Lee's residence,[1] and a commercial property owned by Retreat members. (See Lee Dep. at 49; Leverett Aff. ¶ 6.) The Bank's President at the time, George C. Leverett, III, was in charge of the loan's processing and issuance. (J. Bruce Turner Dep. at 16.)

### B. The Title Insurance Policy

First American, a California corporation, underwrote a lender's title insurance policy (the "Policy") issued to the Bank by the law firm of Kopecky & Roberts. The Policy was issued in reliance on information contained in an authorization request form signed by a representative of Kopecky & Roberts, indicating that there was a legal right of access from a public street to the Retreat Property. On August 28, 2006, just days prior to closing, however, a boundary survey of the Retreat Property was completed which revealed that it did not abut a public road and that there was no easement by which it could be accessed from a public road. Copies of the plat were provided for review to the Bank and Lee at or before the closing. Although Jim Roberts, a principal of Kopecky & Roberts in attendance at the closing, knew that there was no dedicated right of access to the Retreat Property because he had reviewed the plat, he made no specific reference to the access issue at the closing.

---

[1] It appears that the Retreat Note was actually secured by a separate property owned by Lee, not his residence, but this was done in error. (See Lee Dep. at 111.)

3

The Policy insures against loss or damage sustained or incurred by reason of, among other things, "lack of a right of access to and from the land." Coverage is, however, excluded for all losses:

> (a) created, suffered, assumed or agreed to by the insured claimant; [or]
>
> (b) not known to [First American], not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to [First American] by the insured claimant prior to the date the insured claimant became an insured under this policy.

### C. Access to the Retreat Property

It is undisputed that when the Retreat purchased the Retreat Property on September 5, 2006, the Property did not have a dedicated right of vehicular access to any public road and did not abut a public road. Access was instead gained by permission either across a neighboring lot or through a gravel road used by the Soap Creek Marina on land owned by the United States Army Corps of Engineers (the "Corps' Land"). The gravel road remains open for use by the Retreat, and the Soap Creek Marina has never charged for its use.

At the time of purchase in 2006, the Retreat had planned to obtain an easement across the Corps' Land to access the Retreat Property either directly from a public road, Highway 378, and/or from the Soap Creek Marina. In February 2007, the Retreat and the Soap Creek Marina entered into an agreement to allow purchasers of

lots at the planned subdivision to use the Marina shoreline and boat slips. Lee and Clay Antonakos ("Clay") - Dean's son - later purchased the rights to operate the Soap Creek Marina in the spring of 2008 and currently have a lease on the Corps' Land for the Marina's operations.

After the closing, the Retreat initiated efforts to develop the Retreat Property by platting, clearing, and grading the roads it planned to have in the subdivision. Earth-moving equipment was transported onto the Retreat Property using the gravel road on the Corps' Land. Although the Retreat had originally planned on securing dedicated access to Highway 378 from the Army Corps of Engineers, the Retreat later determined that it was too expensive to obtain the planned easement, so it sought alternative means of dedicated access.

On March 11, 2008, Lee and Clay purchased a tract of land which abutted the Retreat Property (the "LeHockey Property"). After acquiring the LeHockey Property, Lee and Clay platted out a new phase for the Retreat development that utilized both the LeHockey Property and the Retreat Property. The new development has an access road that allows both tracts of land to access Highway 378 and the Properties have been marketed jointly as a single development. The Retreat Property does not, however, have dedicated access over the LeHockey Property.

5

### D. The Title Insurance Claims

On October 16, 2007, over a year after the purchase, the Retreat filed a title insurance claim with First American citing the lack of a dedicated right of access to and from the Property. First American denied the Retreat's claim because, among other reasons, the Policy insured the Bank as lender, not the Retreat as owner. A year later, on November 25, 2008, Dean sent a letter to the Bank encouraging it to file a claim with First American because the Bank was the true party in interest under the Policy. The Bank decided against filing a claim, noting in a letter response to Dean that it had knowledge when the loan was issued that the Retreat Property lacked a designated access route. (Def.'s Ex. 71.)

At some point, the Retreat defaulted on its loan obligations and the Bank indicated that it might pursue recovery directly against Lee and Dean under their personal guaranties. In response, Lee, Dean and others formed Cynergy, LLC ("Cynergy"), a Georgia limited liability company, to pay off or purchase the Retreat Note, and on May 8, 2009, Cynergy did so for $1,232,823.76. At the time Cynergy acquired the Retreat Note from the Bank, all members of Cynergy had knowledge that there was no dedicated access to the Property.

On May 12, 2009, Cynergy, as successor to the Bank,[2] filed a

---

[2] In both its original answer (doc. no. 1 at 32-33, ¶¶ 4,5) and its response to Cynergy's statement of material facts (doc. no. 38 ¶ 20), First American disputes Cynergy's claim of successorship under the Policy. However, First American cites no factual basis for its objection and has not argued the point under the pending motions. Moreover, Pamela Nix, a former

new claim under the Policy based on the access issue.   On October 16, 2009, First American denied the claim by asserting that the lack of dedicated access was a condition "assumed, or agreed to" by both the Bank and Cynergy.   Two months later, Cynergy made a demand for payment upon First American pursuant to O.C.G.A. § 33-4-6(a)[3] in the amount of $400,000.00 for alleged losses incurred as a result of the lack of dedicated access.   First American rejected the demand.

### E. Procedural History

Cynergy filed suit in the State Court of Richmond County, Georgia on April 26, 2010, alleging that First American in bad faith breached the Policy by failing to pay Cynergy's insurance claim.   First American removed the case to this Court on May 25, 2010.   The parties are completely diverse and the amount in controversy is greater than $75,000, so subject matter jurisdiction over the case is established in accordance with 28 U.S.C. § 1332(a).

---

First American employee, stated in her deposition that it was her understanding that Cynergy had succeeded to the Bank's rights as the insured claimant under the Policy. (Nix Dep. at 18.)   Because First American has not argued Cynergy's standing to sue, and is otherwise entitled to summary judgment, the Court will not further address the issue.

[3] This statute provides: "In the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer."   O.C.G.A. § 33-4-6(a).

7

The parties have filed cross-motions for summary judgment on the issue of First American's liability under the Policy. Cynergy claims that there is no genuine dispute that the lack of dedicated access to the Property is a condition covered without exception by the Policy; First American, on the other hand, contends that the facts establish the contrary as a matter of law.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Counties, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

8

When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).  Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.  Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam).  A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient.  Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment."  Id.  When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden.  If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated."  Fitzpatrick, 2 F.3d at 1116.  If the movant shows an absence of evidence on a material fact, the non-movant must either

show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

The clerk has given the parties notice of the summary judgment motions and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. nos. 29, 36.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is ready for consideration.

## III. DISCUSSION

The issues in this case are twofold: first, whether the lack of dedicated access to the Retreat Property is a matter subsumed under the Policy's coverage provisions; and second, if so, whether the matter was "agreed to" or "assumed" by the insured and therefore excluded from coverage. The Court's review must naturally begin with construction of the coverage and exclusion

10

provisions of the Policy.

"An insurance policy is simply a contract, the provisions of which should be construed as any other type of contract." Hunnicutt v. S. Farm Bureau Ins. Co., 351 S.E.2d 638, 640 (Ga. 1987) (citation omitted). "Construction of the contract, at the outset, is a question of law for the court." RLI Ins. v. Highlands on Ponce, LLC, 635 S.E.2d 168, 171 (Ga. Ct. App. 2006); O.C.G.A. § 13-2-1. Contract construction proceeds in three steps. First, the court must determine whether the contract instrument's language is clear and unambiguous. RLI Ins., 635 S.E.2d at 171. If so, "the court simply enforces the contract according to the terms, and looks to the contract alone for the meaning." Id. But if the contract is ambiguous, the court must attempt to settle its meaning through application of the rules of construction. Id.; see also O.C.G.A. § 13-2-2. Finally, if the ambiguity cannot be resolved by the court, the issue must be presented to a jury. Id.

"Ambiguity" in this setting is defined as "duplicity, indistinctness, an uncertainty of meaning or expression used in a written instrument, and [it] also signifies . . . open to various interpretations." RLI Ins., 635 S.E.2d at 171 (quoting Early v. Kent, 108 S.E.2d 708, 709 (Ga. 1959)). "The existence or non-existence of an ambiguity in a contract is a question of law for the court." Salvatori Corp. v. Rubin, 283 S.E.2d 326, 328 (Ga. Ct. App. 1981). Because the construction of a contract is a matter for the court, it may be disposed of by summary judgment. Stern's

11

Gallery of Gifts, Inc. v. Corp. Property Investors, Inc., 337
S.E.2d 29, 36 (Ga. Ct. App. 1985); see also Andrews v. Skinner, 279
S.E.2d 523, 525 (Ga. Ct. App. 1981) ("[A] jury question is
presented *only* when the application of the rules of construction
fails to resolve the ambiguity." (emphasis added; citation
omitted)).

Importantly, insurance policies are generally interpreted
against the insurer and in favor of coverage.   Ryan v. State Farm
Mut. Auto Ins. Co., 413 S.E.2d 705, 707 (Ga. 1992).   Moreover,
under Georgia law, the court looks to what a reasonable person in
the position of the insured would understand the policy terms to
mean.   Cont'l Ins. Co. v. Am. Motorist Ins. Co., 542 S.E.2d 607,
610 (Ga. Ct. App. 2000).   "The policy should be read as a layman
would read it and not as it might be analyzed by an insurance
expert or attorney."   Id. (citation omitted).

### A. Coverage

The first issue under consideration is whether Cynergy's
plaint regarding the lack of dedicated access to the Retreat
Property falls within the scope of the Policy's coverage.   The
Policy provides that insurance coverage shall be extended to any
damage sustained or incurred by the insured by reason of, among
other things, "lack of a right of access to and from the land."
There is no access easement appurtenant to the Retreat Property,
but the parties agree that entry may nevertheless be gained by

permission over adjacent lands. The dispute arises from the
parties contrary understandings of the term "right of access."
Cynergy contends that, as stated in the Policy, "right of access"
requires dedicated access, i.e., an access easement. In contrast,
First American insists that the term "right of access" encompasses
*any* legal means of entry onto the Retreat Property, including
permissive access.[4] Construing the Policy in favor of coverage,
Cynergy's understanding prevails.

On its face, the term "right of access" could reasonably
sustain either of the parties' asserted interpretations. To
illustrate, courts have directly equated a "right of access" with
an "easement of access," an association that obviously supports
Cynergy's contention. See Harper Inv. v. Dep't of Transp., 554
S.E.2d 619, 622 (Ga. Ct. App. 2001) ("[T]he right of access, or
easement of access, to a public road is a property right which
arises from the ownership of land contiguous to a public road . . .
. " (citation omitted)). Moreover, title insurance policies are
generally understood to safeguard the "reasonably anticipated
implications of ownership." U.S. Life Title Ins. Co. of Dallas v.
Hutsell, 296 S.E.2d 760, 763 (Ga. Ct. App. 1982) (citation
omitted); see also Fidelity Nat'l Title Ins. Co. v. Keyingham Inv.,
LLC, 702 S.E.2d 851, 853 (Ga. 2010) ("One of the very purposes of
title insurance is to protect a party from . . . the party not

---

[4] Notably, Pamela Nix, a former First American employee, stated at her
deposition that she understood the term "right of access" to mean either that
property touches a public road or has a recorded easement. (Nix Dep. at 19-
20.)

receiving *an interest in land*." (emphasis added)).  So understood, the term appears to signify a legally enforceable right appurtenant to realty, like an easement, rather than a mere permissive license or privilege.  See <u>Barton v. Gammell</u>, 238 S.E.2d 445, 446-47 (Ga. Ct. App. 1977) ("An easement always implies an interest in the land in and over which it is to be enjoyed, whereas a license merely confers a personal privilege to do some act or acts on the land without possessing any estate therein." (citation omitted)); <u>Sutter v. Sims</u>, 563 S.W.2d 533, 535-36 (Mo. Ct. App. 1978) (plaintiffs permissive use of an existing roadway over defendants' land to get to and from a public road did not constitute a legally enforceable right).  On the other hand, permissive access like that present in this case does, under some circumstances, constitute legally significant "means of access, ingress, and egress" to land.  See <u>Moore v. Dooley</u>, 241 S.E.2d 232, 233 (Ga. 1978).  For example, permissive access will defeat a claim for an easement by necessity in Georgia.  <u>Id.</u>

When interpreting a contract, the court's overriding charge is to apprehend and give effect to the parties' intentions.  O.C.G.A. § 13-2-3.  In this instance, there is little to be gleaned concerning the parties' understanding of the term "right of access" from its plain meaning, the structure of the Policy, or the surrounding circumstances.  As a consequence, the resulting ambiguity must be resolved in favor of coverage.  <u>Ryan</u>, 413 S.E.2d at 707.  Cynergy's asserted construction therefore prevails - the

14

Court holds that "right of access" as used in the Policy means a legally enforceable access easement.

With this understanding of the Policy's coverage in place, Cynergy has the burden of proving that the facts in this case actually fall within the scope of such coverage.  Chix v. Ga. Farm Bureau Ins. Co., 258 S.E.2d 208, 209 (Ga. Ct. App. 1979).  Cynergy has succeeded.  It is undisputed that no dedicated right of access to the Retreat Property exists or has existed since the Policy's issuance.  Although the Retreat Property may be accessed over either the LeHockey Property or the Corps' Land, the access in either case is permissive, akin to a license rather than an easement.  First American points out that access over the Corps' Land is pursuant to federal law that requires the Corps of Engineers to provide public access to projects like the Soap Creek Marina, 16 U.S.C. § 460d; however, that access is a privilege accruing to the public at large and is contingent upon the Secretary of the Army's determination and regulations.[5]  An insured party might reasonably conclude that, unlike an easement, the above means of access do not qualify as "rights of access" to property intended for residential development.  See Liverpool & London & Globe Ins. Co. v. Georgia Auto & Supply Co., 115 S.E. 138, 144 (Ga.

---

[5] Specifically, the statute provides that "[t]he water areas of all [water resource] projects shall be *open to public use generally* for boating, swimming, bathing, fishing, and other recreational purposes, and ready access to and exit from such areas along the shores of such projects shall be maintained for general public use, *when such use is determined by the Secretary of the Army not to be contrary to the public interest, all under such rules and regulations as the Secretary of the Army may deem necessary .  .  .  .*"  16 U.S.C. § 460d (emphasis added).

Ct. App. 1922) ("[T]he parties [to an insurance contract] are presumed to have had in contemplation the nature and character of the business [of the insured], and to have foreseen the usual course and manner of conducting it."). Upon the foregoing, Cynergy has successfully shown that its claim falls within the scope of the Policy's coverage.

### B. Exclusions

The next question before the Court is whether the Policy's coverage is nevertheless excluded under the particular facts of the case. The Policy expressly provides that coverage over any matters "assumed or agreed to by the insured" shall be excluded. First American maintains that all parties were aware of the lack of dedicated access when the Policy was issued and coverage should, as a consequence, be excluded under this provision.[6] According to Cynergy, however, the evidence adduced cannot reasonably sustain this finding. The Court concludes that the evidence and undisputed facts show that the lack of dedicated access was indeed an "assumed" condition.

---

[6] First American also argues that coverage should be excluded because Cynergy did not disclose the defect in writing. Exclusion 3(b) of the Policy provides that coverage shall be excluded for all matters "not known to [First American], not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to [First American] by the insured claimant prior to the date the insured claimant became an insured under th[e] policy." Cynergy has stipulated that its members were aware of the access issue when it succeeded to the Policy (doc. no. 40 at 10, ¶ 28), but the evidence shows that First American was also on notice when Cynergy "became the insured under th[e] policy" in 2009. For instance, Dean's letter claim dated October 16, 2007 apprised First American of the lack of dedicated access at the Retreat Property.

As already noted, insurance contracts are generally construed in favor of coverage, Ryan, 413 S.E.2d at 707; accordingly, exclusions which purport to limit coverage are read narrowly. "[E]xclusions to an insurance policy require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms." RLI Ins., 635 S.E.2d at 172 (citation omitted). Nevertheless, rules of construction provide that "[a]ll the attendant and surrounding circumstances may be proved." Id. (citing O.C.G.A. § 13-2-2(1)). Under Georgia law, "an insurer seeking to invoke a policy exclusion carries the burden of proving its applicability in a given case." First Specialty Ins. Corp. v. Flowers, 644 S.E.2d 453, 455 (Ga. Ct. App. 2007). If the insurer is able to meet this burden, "the burden then shifts to the insured to come forward with other evidence creating a genuine issue of fact over whether the exclusion is applicable." Id. at n.2 (citation and punctuation omitted).

At the outset, the Court must clarify an issue raised by First American. First American has made much ado about the fact that Cynergy's members knew of the access issue before succeeding to the Policy, and some members – Lee and Dean – may have even known of the condition before the Policy was issued. According to First American, this knowledge precludes Cynergy's right to recover. But it is undisputed that the Policy was entered into by the Bank, *not*

Cynergy. Therefore, it is the Bank's knowledge, not Cynergy's, that will determine the applicability of the Policy exclusions in this case. The rights and obligations established under the Policy were solidified at the time the Policy agreement was formed, and any knowledge harbored by the Bank's successor-in-interest is impotent to alter those terms. See Fidelity Nat'l Title Ins. Co. v. Matrix Fin. Servs. Corp., 567 S.E.2d 96, 101 (Ga. Ct. App. 2002) (holding that a successor insured's purchase of indebtedness with knowledge of a property defect does not undermine title insurance coverage over the defect). Nevertheless, any defense that First American could have asserted against the Bank is effective as against Cynergy by virtue of its knowledgeable successorship.[7]

   1. "Agreed To"

First American contends that the Bank "agreed to" the lack of dedicated access. Here, there is no evidence that the Bank and First American purposely discussed or had a meeting of minds specifically regarding the lack of dedicated access. But even absent specific discussion and agreement on the access issue *itself*, the plain terms of the Policy show that the Bank nevertheless agreed to *circumstances* under which coverage over the

---

   [7] The Policy provides that First American retains "all rights and defenses as to any successor [i.e., Cynergy] that [it] would have had against any predecessor insured [i.e., the Bank], *unless* the successor acquired the indebtedness as a purchaser for value without knowledge of the asserted defect." (emphasis added). The parties agree that all members of Cynergy knew of the access issue at the time. (Doc. no. 40 at 10, ¶ 28.) It is worth noting that if Cynergy *did not know* that the Retreat Property lacked dedicated access at the time it acquired the Retreat Note, then under the cited provision First American could not defend against Cynergy's claim, as it now does, by asserting that the Bank "agreed to" or "assumed" the matter.

18

issue would be excluded. That is, the Bank agreed more generally that coverage would be excluded for any issue "assumed." Whether the access issue was indeed "assumed" in this case is addressed next.

### 2. "Assumed"

#### a. Construction

First American insists that the Bank knew of the Property's lack of access and therefore "assumed" the defect. The Policy does not define the term "assume," so the Court must once again discern meaning through construction. In plain usage, "to assume" means "to take to or upon oneself," or "to take for granted." Webster's Third New International Dictionary 133 (1976). As used in title insurance policies, "to assume" has generally been held to require actual knowledge of the nature and extent of some condition. See Am. Sav. & Loan Ass'n v. Lawyers Title Ins. Corp., 793 F.2d 780, 784 (6th Cir. 1986) ("'Assume,' under [insurance policy] definition requires knowledge of the specific title defect assumed."); see also Lawyers Title Ins. Corp. v. Research Loan & Inv. Corp., 361 F.2d 764, 769 (8th Cir. 1966) (title defect assumed because insured had reason to believe that defect existed and did not rely on title insurer for advisement); Peachtree Mgmt. & Inv. Co. v. Pioneer Nat'l Title Ins. Co., 541 F. Supp. 51, 54 (N.D. Ga. 1981) (title defect assumed by insured claimant because insured's shareholders knew of the transaction which resulted in the defect); Malkin v. Realty Title Ins. Co., 223 A.2d 155, 157-58 (Md. 1966) (encumbrance

assumed because insured inspected property and freely elected to complete purchase with knowledge of the defect); compare Fidelity Nat'l Title Ins. Co, 567 S.E.2d at 101-02 (insured did not assume defect through negligence).

The emphasis on knowledgeable acquiescence inherent in both the common and contractual uses of the term "assumed" is corroborated by an analogue from tort law – the doctrine of assumption of the risk. "In its simplest and primary sense, assumption of the risk means that the plaintiff, in advance, has given his consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from *a known risk arising from what the defendant is to do or leave undone.*" Vaughn v. Pleasant, 471 S.E.2d 866, 868 (Ga. 1996) (emphasis in original). "Knowledge of the risk is the watchword of assumption of the risk . . . ." Id. (citation omitted). The doctrine applies if the plaintiff "(1) had actual knowledge of the danger; (2) understood and appreciated the risks associated with such danger; and (3) voluntarily exposed himself to those risks." Id.

Illumined by the plain meaning of the term along with its use in various legal contexts, the Court concludes that "assume" as used in the Policy means that the Bank must have had actual, subjective knowledge of the access issue and appreciated its effect.

### b. *Analysis*

Although Cynergy urges otherwise, the evidence shows that the Bank "assumed" the lack of dedicated access to and from the Retreat Property. Attached to First American's motion is the affidavit of George C. Leverett III, the Bank's President at the time the Policy was issued and the representative in charge of processing the underlying loan. In his affidavit, Leverett states unequivocally that during the loan application stage, before the Policy was issued, he "was aware that the [Retreat Property] appeared to be landlocked." (Leverett Aff. ¶ 4.) "A corporation is bound by knowledge of an officer or agent when the knowledge pertains to matters within the scope of the officer's or agent's duties." Keenan v. Hill, 378 S.E.2d 344, 348 (Ga. Ct. App. 1989). Here, it is undisputed that Leverett was an officer of the Bank acting within the scope of his authority as President during the loan processing. The facts, therefore, show that the Bank had actual knowledge that the Retreat Property lacked dedicated access.

Further, the evidence shows that the Bank appreciated the risk attendant to the access issue. Leverett was an experienced executive having served over twenty years as the Bank's President (J. Bruce Turner Dep. at 56), and the details of the Retreat loan demonstrate that the transaction was executed with care and deliberation. In addition to obtaining a deed to secure debt on the Retreat Property, the Bank also acquired deeds to two additional properties and the personal guaranties of both Lee and Dean. The Bank's loan was a short term acquisition loan and, as

21

Leverett indicated in his affidavit, "obtaining adequate collateral on the loan was more important to [the Bank] than the issue of how the property would be accessed." (Leverett Aff. ¶ 5.)  Leverett's statement has been corroborated by the Bank's Vice President, Maria Bradford.  Although Bradford stated in her deposition that she does not know whether Leverett was aware of the access issue in 2006, she is personally familiar with the details of the Retreat loan and has opined that the access issue would not have obstructed the Retreat loan because the Bank "had other collateral."  (Bradford Dep. at 19.)  The only reasonable inference available from the evidence is that the lack of dedicated access was of no practical significance to the Bank - Leverett understood the implications of the issue and accounted for it by securing ample collateral.

Finally, the Bank's conduct further evinces its intent to assume the risk that the property lacked dedicated access.  "No one is better positioned to interpret an insurance contract than a party to that contract . . . ."  Hooters of Augusta, Inc. v. Am. Global Ins. Co., 272 F. Supp. 2d 1365, 1380 (S.D. Ga. 2003).  "The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning." Restatement (Second) of Contracts § 202, Comment g (1981).  Here, the evidence shows that in the two and a half years between the Policy's issuance and the termination of the Bank's rights under the Policy, the Bank did not file a claim.  Further, the Bank even refused to pursue a claim when pressed to do so by Dean.  In

response to Dean's letter urging the Bank to file a claim with First American, the Bank issued a letter signed by J. Bruce Turner, the Bank's Executive Vice President, and approved by Leverett, stating that "[w]hen [the Bank] originally made this loan, we knew that there was no designated access to [the Retreat Property]." (Def.'s Ex. 71.)

Cynergy has presented no evidence to rebut these facts; instead, it contends, first, that the law prohibits exclusion in this case, and, second, that Leverett's affidavit is inadmissible and ought not to be considered by the Court. It is true, as Cynergy points out, that policy exclusions may not be invoked to eviscerate insurance coverage. See Transp. Ins. Co. v. Piedmont Constr. Group, LLC, 686 S.E.2d 824, 828 (Ga. Ct. App. 2009). But that is not the case here. It is only a very specific matter – the lack of dedicated access – that First American argues has been excluded from the comprehensive coverage extended under the Policy. The reason exclusions are read narrowly and scrutinized with suspicion by courts is to avoid an insured being taken unawares by the insurer. But in this case, the insured Bank is a sophisticated business entity and the evidence shows that it was aware of, understood, and accounted for the risks associated with the Retreat Property when the Policy was issued. Therefore, Cynergy's first objection misses the mark.

Even if the exclusion is permissible, Cynergy contends that it is not applicable in this case because Leverett's affidavit

statements ought not to be considered by the Court and, therefore, the Bank's knowledge cannot be proven.  According to Cynergy, (1) the statement regarding Leverett's knowledge of the access issue is phrased in uncertain terms and therefore not admissible pursuant to Fed. R. Civ. P. 56(c)(4), and (2) the affidavit statements are inadmissible hearsay.  Given the dispositive effect of the Court's consideration of the affidavit, an extended discussion of Cynergy's objections is warranted.

### i. Rule 56(c)(4) Objection

The phrasing of Leverett's statement about his knowledge of the access issue is not defective.  Leverett's affidavit states that at the loan application stage he "was aware that the tract appeared to be landlocked."  (Leverett Aff. ¶ 4.)  Cynergy objects that because the statement uses the words "aware" and "appeared" it is too equivocal to be admissible under Rule 56(c)(4), which provides that affidavits must "be made on personal knowledge, [and] set out facts that would be admissible in evidence."  The Court is not persuaded.  Title insurance is designed to insure against risks.  See First Am. Title Ins. Co. v. Action Acquisitions, LLC, 187 P.3d 1107, 1113 (Ariz. 2008) ("Title insurance principally protects against unknown and unknowable risks . . . .").  And in this case, the statement at issue clearly betrays personal knowledge on Leverett's part of the risk that the Retreat Property might lack a dedicated right of access.  Cynergy's objection would require that the statement be phrased with a level of epistemic

certainty for which the notion of assumption is simply not calibrated, and the objection therefore fails.

### ii. Hearsay Objection

Cynergy also argues that because Leverett is now deceased and cannot be cross-examined at trial, the statements contained within his affidavit are inadmissible hearsay and may not be considered by the Court in passing on the parties' cross-motions for summary judgment. See Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999) ("[I]nadmissible hearsay cannot be considered on a motion for summary judgment." (citation omitted)); Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must . . . *show that the affiant or declarant is competent to testify on the matters stated.*" (emphasis added)). However, "affidavits and statements that would constitute hearsay, if reducible to admissible evidence, may be properly considered in support of a motion for summary judgment." Saunders v. Emory Healthcare, Inc., 360 Fed. Appx. 110, 112 (11th Cir. 2010). The question for the Court, then, is whether the statements would be admissible at trial.

First American responds that Leverett's statements are admissible on either of three bases: (1) as admissions by a party-opponent, Fed. R. Evid. 801(d)(2); (2) as statements against interest, Fed. R. Evid. 804(b)(3); or (3) as sufficiently trustworthy to qualify for consideration, Fed. R. Evid. 807. The first two contentions are nonstarters. Admissions by party-

opponents are admissible because they are not hearsay, Fed. R. Evid. 801(d)(2); however, Leverett's statements do not qualify as admissions by a party-opponent because neither he nor his employer, the Bank, are party-opponents in this case.[8]   Further, because of their timing, Leverett's statements are not excepted from the hearsay rule as statements against interest under Rule 804(b)(3). Leverett's statements could certainly be construed as against the Bank's interest because they appear to render invalid any claim the Bank might have had under the Policy due to foreknowledge of the access issue.   See   Fed. R. Evid. 804(b)(3) (providing that statements which "render invalid a claim by the declarant against another" are not excluded under the hearsay rule).   Rule 804(b)(3) only excepts from the hearsay rule, however, statements that are contrary to the declarant's pecuniary or proprietary interest "*at the time of [their] making.*" (emphasis added).   Here, the Leverett affidavit was signed on October 1, 2009, several months *after* the

---

[8]   Cynergy, the Bank's successor-in-interest under the Policy, is of course a party-opponent.   Under common law, "principles of privity . . . allowed an admission by a transferor to be admitted as evidence in litigation involving the transferee."   Kesey, LLC v. Francis, No. CV 06-540-AC, 2009 WL 909530, at *17 (D. Or. Apr. 3, 2009); see 30B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 7019 (2d ed. 2011) (hereinafter Wright & Miller).   However, the Federal Rules of Evidence have truncated this privity allowance with Rule 801(d)(2).   Wright & Miller § 7019.   Rule 801(d)(2) expressly provides that statements are attributable to a party-opponent either through adoption, agency, or conspiracy, but no provision is made for attribution based on privity.   See also Kesey, 2009 WL 909530, at *17 ("The majority of federal courts have read [Rule 801(d)(2)] literally, determined that the draftsmen did not intend to give the courts the ability or discretion to add new categories of admissions, and held that privity-based admissions are not within the language of the rule."); Huff v. White Motor Corp., 609 F.2d 286, 290-91 (7th Cir. 1979).   With privity being an improper basis for attribution, and the evidence being devoid of alternative bases, Leverett's affidavit statements do not qualify as party-opponent admissions.

Bank had transferred its interest in the Policy. In short, the affidavit statements were not against the Bank's interest when made because at that time the Bank had no rights under the Policy.

The only provision remaining under which the affidavit statements might qualify for consideration is Rule 807, which provides:

> [A] hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804 [when]: (1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807(a). Rule 807 is to be used very rarely, and is not to be taken as "a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions contained in Rules 803 and 804(b)." United States v. Mathis, 559 F.2d 294, 299 (5th Cir. 1977).[9] Nevertheless, as the analysis below indicates, the Court concludes that the Leverett affidavit statements may be presently considered based on reliability, materiality, and need.

In order to be admitted under Rule 807, there must be a "clear basis of trustworthiness" to support the out-of-court statement. F.T.C. v. Washington Data Resources, No. 8:09-cv-2309-T-23TBM, 2011 WL 2669661, at *4 (M.D. Fla. July 7, 2011) (citation omitted). In

---

[9] Decisions of the Court of Appeals for the Fifth Circuit that were announced prior to October 1, 1981, are binding precedent in the Eleventh Circuit. See Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

determining whether such basis exists, courts should consider several criteria, including:

(1)   certainty that the statement was made, Wright & Miller § 7095;

(2)   whether the statement was made under oath, id.;

(3)   whether the statement was recorded, 2 Kenneth S. Broun et al., McCormick on Evidence § 324 (6th ed. 2009);

(4)   whether the statement was based on personal knowledge of the declarant, Wright & Miller § 7095;

(4)   the declarant's partiality, id.;

(5)   the presence or absence of time to fabricate, id.;

(6)   whether the statement was made voluntarily and free of coercion, id.;

(7)   whether the statement has been recanted or reaffirmed, id.;

(8)   the declarant's mental condition at the time the statement was made, United States v. Hall, 165 F.3d 1095, 1111 (7th Cir. 1999); and

(9)   whether the declarant had been diagnosed with a life-threatening illness, Fossyl v. Milligan, 317 Fed. Appx. 467, 477 (6th Cir. 2009).

In this case, the circumstances are such that Leverett's statements may be deemed reliable.   To begin with, there is no doubt that the statements were in fact made and clearly recorded within a sworn affidavit.   Although an oath alone is inadequate to establish a circumstantial guarantee of trustworthiness, United States v. Fernandez, 892 F.2d 976, 981 (11th Cir. 1989), it ought nevertheless to be considered as a sound starting point.   Moreover, the statements are based on Leverett's personal knowledge and

concern a matter peculiarly within the province of that knowledge – his own state of mind.

Additional circumstances further mark the affidavit statements as reliable. For instance, at the time the statements were issued Leverett was a non-party to the action, and though time would have permitted fabrication, there is no indication that Leverett harbored any bias either in favor of First American or against Cynergy. The statements are presented in a narrative form and evidence shows that Leverett, notwithstanding his illness, remained lucid and had a substantial role in drafting the affidavit,[10] thus mitigating concern that the statements were the product of coercion or otherwise undue suggestion. Finally, the statements were made after Leverett had been diagnosed with cancer and the illness may have reduced his incentive to misrepresent or conceal information.[11] See Fossyl, 317 Fed. Appx. at 477. Thus, upon review of the facts surrounding the affidavit's drafting, the Court concludes that the statements therein bear a clear basis of trustworthiness.

---

[10] To illustrate, Bradford testified to the following:

Q: All right. Tell me, if you can, why there were so many drafts [as many as five] of the affidavit of George Leverett?

MB: Wording. [Leverett] just wanted – he reviewed it and decided he should word it a little differently. . . .

(Bradford Dep. at 33.)

[11] There is no evidence that the statements were made by Leverett under a belief of impending death, nor do the statements concern the cause or circumstances of his death. Therefore, the statements are not admissible under Rule 804(b)(2). Nevertheless, the Court agrees with the Sixth Circuit that a declarant's affliction with a life-threatening illness, even without a belief of impending death, is a factor that weighs in favor of reliability under Rule 807. See Fossyl, 317 Fed. Appx. at 477.

Further, the issue to which the affidavit statements speak – Leverett's awareness of the lack of dedicated access to the Retreat Property – is material to a determination of the insurance coverage in this case. Moreover, the need for the statements is great because the Bank's knowledge is the fulcrum upon which liability turns, but evidence on this point is scant. Bruce Turner, the Bank's Executive Vice President, has stated that Leverett took very few notes on the loans he processed. (Turner Dep. at 38.) And neither Turner nor Maria Bradford, both Bank executives, is aware of any records or information that might illuminate Leverett's state of mind at the time in question. (Bradford Dep. at 13; Turner Dep. at 48.) Accordingly, the need for Leverett's affidavit statements is considerable and weighs in favor of admissibility. Finally, in the Court's opinion, consideration of sworn and otherwise reliable affidavit statements on a key issue for which very little alternative evidence exists will assist the search for truth and further the ends of justice.

Notwithstanding these considerations, Cynergy asserts that Leverett's statements are per se inadmissible, citing Herzog v. Castle Rock Entm't, 193 F.3d 1241 (11th Cir. 1999) for this proposition. In Herzog, the plaintiff sued the writer-director, producer, and distributor of a motion picture, alleging that the defendants infringed her copyright in a screenplay she had written. To survive the defendants' motion for summary judgment, the plaintiff was required to produce evidence of, among other things,

defendants' access to her copyrighted work.   On this point, the
plaintiff presented remarks made by an alleged intermediary between
her and the defendants to show that the intermediary could have
provided defendants with the work in question.   The alleged
intermediary died before the case was initiated.   The Herzog court
held that the deceased's statements were inadmissible hearsay and
therefore could not be factored into a decision on summary
judgment.   Id. at 1254-55.

Although the deceased's statements in Herzog were excluded as
inadmissible hearsay, the court neither announced nor applied a
categorical rule as Cynergy would have it.   Moreover, a careful
review reveals that the facts of that case stand in stark contrast
to those in the present action.   First, in contrast to Leverett's
statements, the deceased's remarks in Herzog constituted double
hearsay - the remarks were made to a non-party and disclosed during
the latter's deposition testimony.   Id. at 1252.   In addition, the
recipient in Herzog only vaguely recalled the deceased declarant's
statements.   Id. at 1254.   In short, the statements at issue in
Herzog bore none of the hallmarks of reliability present in this
case, such as having been sworn, certainly made, and recorded.

Further, the deceased declarant's remarks in Herzog possessed
only marginal probative value.   The remarks were addressed to an
issue material to the plaintiff's case - access to the copyrighted
work - but, as the court noted, the remarks only tended to
establish the fact in question when conjoined to a number of

31

assumptions for which no evidence had been adduced. Id. at 1255. Here, however, Leverett's statements directly and comprehensively address the material fact in dispute, i.e. whether the Bank was aware of the Retreat Property's lack of dedicated access. Finally, the need for the statements at issue in this case is more significant than was the case in Herzog. The fact at issue in that case concerned a state of external affairs which a number of individuals might be able to speak on, but in this case the issue regards a fact – the declarant's knowledge – that only the declarant's own revelations are competent to address.

### 3. Summary

In sum, the Court concludes that coverage is excluded in this instance. Contrary to Cynergy's assertion, the exclusion at issue does not eviscerate coverage but merely carves a narrow exception for matters "assumed." The evidence and undisputed facts shows that Leverett, acting within the scope of his duties as Bank President, had actual knowledge of the lack of dedicated access to the Retreat Property before the Policy was issued; that he nevertheless proceeded with the Retreat loan; that he took measures to secure the loan in light of its condition; and that the Bank, even when pressed to do so, refused to file an insurance claim with First American based on the access issue. The only reasonable inference available is that the Bank "assumed" the Retreat Property's lack of dedicated access and that, as a consequence, coverage over the issue must be excluded pursuant to the terms of

the Policy. Cynergy's objections to Leverett's affidavit are unavailing – the statements bear indicia of reliability and are highly probative of a material fact for which other evidence is nonexistent.

## IV. CONCLUSION

Based upon the foregoing, Defendant First American's motion for summary judgment (doc. no. 25) is hereby **GRANTED** as to all claims. Correspondingly, Plaintiff Cynergy's motion for summary judgment (doc. no. 30) is **DENIED**. The pending motion for hearing of oral argument (doc. no. 35) is **DENIED AS MOOT**. The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendant. The Clerk shall terminate all deadlines and motions, and **CLOSE** the case.

**ORDER ENTERED** at Augusta, Georgia, this _18th_ day of January, 2012.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA